UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 06-216 (RCL) |
| | : | |
| DAMIEN LEWIS | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, submits this memorandum in aid of sentencing in the instant case. For the reasons set forth herein, the government respectfully recommends that the Court sentence the defendant to a period of incarceration to the lowest end of the applicable Guidelines range of 30-37 months' incarceration, and that defendant pay to the victim an amount of restitution.[1]

**I.   BACKGROUND**

Defendant began dating Marquita Holmes, the daughter of the victim, Franklin Holmes, in or around July 2005. At various times during the relationship, defendant and Ms. Holmes lived together, and, for a several-week period in 2005, defendant stayed with Ms. Holmes at her parents at their residence in Manassas, Virginia.

Sometime in June 2006, Ms. Holmes, while staying with defendant in an apartment located in the Barry Farms housing complex in the District, at 1500 Eaton Road, S.E., Washington, D.C., called her father Franklin Holmes and asked for money for food and cigarettes. Mr. Holmes refused to give Ms. Holmes money but instead beseeched his daughter to come home.

---

[1] See section II.B., infra.

On Father's Day, June 18, 2006, Ms. Holmes again called her father and requested money from him. He again said no and asked her to come home. At that time she told her father that she did not feel free to leave the apartment because defendant had once told her that if she left, he would harm either the father of her four-year old child or her own family.

On or about June 21, 2006, Ms. Holmes called her father and told him that she would come home if he gave defendant $1,800 that defendant claimed Mr. Holmes owed him. Mr. Holmes denied owing defendant any money and refused to pay the money. At approximately 7:00 p.m. that same evening, Ms. Holmes and defendant, while still staying at the 1500 Eaton Road, S.E., apartment, placed several calls to Mr. Holmes at his home in Manassas, Virginia. During the first of these phone calls, defendant told Mr. Holmes that he wanted his "money." Mr. Holmes repeatedly responded that he did not owe defendant any money. At one point, defendant advised Mr. Holmes that he would accept $1,400 from him as payment, but Mr. Holmes again refused to pay defendant. At one point, defendant instructed Mr. Holmes to wire him the money to a Western Union location in Capitol Heights, Maryland. Despite his great concern for his daughter, however, Mr. Holmes continued to refuse to pay any money to defendant.

Shortly after 8:00 p.m. on June 21, 2006, a call was placed from the apartment where defendant was staying in Southeast Washington, D.C., to Mr. Holmes's residence in Manassas, Virginia. During a subsequent conversation between defendant and Mr. Holmes, defendant again demanded $1,400 from Mr. Holmes. After Mr. Holmes once again refused to pay defendant any money, defendant told Mr. Holmes that he was going to put his daughter Marquita Holmes out on the street for prostitution. In addition, defendant stated that if the money was not paid to him, he would send some of his "soldiers" to Mr. Holmes's residence in Virginia and have them "shoot up"

his house.  As a result of these communications, Mr. Holmes reasonably believed defendant's threat that he would harm either Marquita Holmes or Mr. Holmes himself, or both.  Nevertheless, Mr. Holmes did not pay defendant any money.

Instead, after the phone calls finally ended, Mr. Holmes and his wife contacted a family friend who worked as a detective at the Manassas City Police Department.  The friend then contacted the FBI, who in turn began their investigation.  After the FBI interviewed the victim, Mr. Holmes, they set up surveillance outside of the apartment building where defendant was reportedly staying.  The following morning, June 22, 2006, defendant and another individual were observed leaving the residence and entering a vehicle.  Defendant was eventually captured by agents at a gas station located in Southeast, Washington, D.C.  Following defendant's arrest, while defendant was incarcerated, he placed a telephone call to a female acquaintance.  During the phone conversation, which was recorded, defendant admitted that he had made several phone calls to the victim and had threatened to force Marquita Holmes into prostitution unless Mr. Holmes paid him some money.  Defendant also admitted that around the time of his arrest he gave Marquita Holmes a black eye.  As a result of this incident, the victim suffered a significant amount of financial loss, in addition to great emotional loss.[2]

## II.   SENTENCING CALCULATION

### A.   Statutory Minimum/Maximum

The maximum term of incarceration that may be imposed for the charge of Interstate Communications With Intent to Extort under 18 U.S.C. § 875(b) is twenty (20) years.  In addition, the maximum fine is $250,000.  See Presentence Report ("PSR") ¶¶ 73, 85.

---

[2] See PSR ¶¶ 89, 90.

B.  United States Sentencing Guidelines Calculation

The Government agrees that defendant's base offense level in this case is 18, and that this level should be increased by two points pursuant to Section 2B3.2(b)(1) of the Sentencing Guidelines, since the offense involved an expressed threat of death, bodily injury, or kidnaping. See PSR ¶¶ 18, 19. Further, the Government agrees that defendant's adjusted offense level should be decreased by three point pursuant to Section 3E1.1 of the Sentencing Guidelines. He entered a guilty plea early enough in the proceedings to avoid the Government's having to fully prepare for trial, and he appears to have met the requirements of Section 2E1.1 with respect to cooperating in the pre-sentence investigation. In addition, the Government agrees that defendant's Criminal History Category is III. Thus, defendant's Guidelines range is 30-37 months. See PSR ¶ 74.

C.  The Impact of Booker

The Court should impose a sentence within the Sentencing Guidelines range. In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that the mandatory application of the United States Sentencing Guidelines violates the Sixth Amendment principles articulated in Blakely v. Washington, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). Booker, 543 U.S. at 258. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of

a sentence different from that described in the Guidelines.  See 18 U.S.C. Section 3554(c)(2).  The sentence will then be subject to review by courts of appeals for "reasonableness."  Id. at 261.

In Booker's wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines.  See Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing).  "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing."  Booker at 262 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)).  In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable per se.  Not only is a sentence within the Guideline range reasonable per se, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair and uniform sentences.

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 253 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 250 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction.") (emphasis

5

supplied); id. at 292 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 304-05 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").

     Since the Guidelines currently represent the only existing benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals. This is so, said the court in United States v. Wilson, 350 F. Supp.2d 910 (D. Utah 2005) – the day after Booker was decided – because the Guidelines represent the product of an expert commission, that has studied the sentencing process at great length, under the specific mandate of Congress, to fashion recommended sentences that carry out the purposes defined by Congress. The resulting Guidelines, Wilson held, plainly reflect the public's will, as expressed by their democratically elected representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference. Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness. For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence. In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons." Id. at 950. A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants. In this case, as explained further in section III below, no unusual

circumstances exist that warrant an exception to the preference for Guidelines sentencing in this case.

### III.     DEFENDANT SHOULD BE SENTENCED AT THE LOW END OF THE GUIDELINES RANGE OF 30-37 MONTHS

In the instant case, the Guidelines sentence takes into account the seriousness of defendant's conduct, that is, interstate communications with intent to extort. The total offense level is calculated based upon the expressed threats made by defendant to physically injure or even kill the victim, and/or to physically injure or kidnap the victim's daughter. The offense level was then lowered by three levels to reflect that defendant accepted responsibility for his actions and entered a timely plea of guilty.

Furthermore, defendant's criminal history had a significant impact on the Guidelines calculations in this case, and appropriately so. Defendant was convicted in 2003 of Possession of Cocaine, and in 2004 of Second Degree Assault. The facts of the latter case are particularly significant, as they reflect a very similar course of conduct in which defendant engaged in this case.. As set forth in further detail in the PSR at pages 8-9, defendant broke into the residence of the mother of his children without permission and in violation of a protective order. Defendant entered the residence through a window, armed himself with a knife, then lay in wait for the victim to arrive home. Upon the victim's arrival, defendant grabbed a 9-year old child to prevent her from leaving the house with his and the victim's 1-year old daughter. Eventually, the child and the infant were able to leave the house, but defendant continued to hold the victim captive: defendant pulled the phone line out of the wall, forced her to a vehicle, then continued to hold her against her will while

they remained inside the vehicle. Defendant further assaulted the victim by slamming her head into the vehicle as the victim tried to make her escape from him. The ordeal finally ended when defendant took someone else's car and fled the scene. As a result of this offense, defendant is currently listed as a "fugitive" in this case for violation of probation; he is also wanted for a probation violation for his 2003 possession of cocaine conviction.

The Guidelines calculation of defendant's criminal history take into account his prior convictions and the fact that he was on probation in the above cases at the time he committed the instant offense. The Guidelines appropriately call for a more sever sentence based upon this history, a factor that further supports the conclusion that a sentence within the Guidelines range would be reasonable in this case.

In summary, the advisory Guidelines range in this case provides for a reasonable sentence, one that takes into account the relevant sentencing factors set forth in 18 U.S.C. § 3553(a).[3] The

---

[3] It is the government's position that 18 U.S.C. § 3553(a)(2)(1), which directs that the sentencing court consider the "the nature and circumstances of the offense and the history and characteristics of the defendant," should not be read to mean that the sentencing court should take into account all of the defendant's personal characteristics in imposing a sentence of incarceration. Congress, in enacting the Sentencing Reform Act, specifically prohibited certain personal characteristics from being considered in sentencing. Thus, sentences cannot be based on a defendant's race, sex, national origin, creed or socioeconomic status. See 28 U.S.C §944(d). Other characteristics can be taken into account only to the extent they are relevant. Id. Congress specifically directed that the Commission assure that the guidelines reflected "the general inappropriateness" of considering certain factors, including the defendant's family ties and responsibilities, and community ties, in recommending terms of imprisonment. 28 U.S.C. § 944(e).

Thus while Congress contemplated that a defendant's age, family ties and responsibilities, community ties and similar factors may be appropriately considered with respects to incidents of sentencing other than incarceration, for example, the length and type of community service, the amount of a fine, or the conditions of probation, it recognized that these same factors have no place in determining whether and for how long a defendant should be imprisoned. We recognize that post-Booker, the Sentencing Guidelines are advisory. Nevertheless, the Guideline

Government therefore asks that the Court impose a sentence at the lowest end of the applicable Guidelines range of 30-37 months' incarceration, and a term of supervised release as provided by statute. In addition, the Government requests that the Court order the payment of restitution to the victim in this case.

                                  Respectfully,

                                  JEFFREY A. TAYLOR
                                  United States Attorney

                                  /s/

By:    Donnell W. Turner
        Assistant United States Attorney
        Maryland Bar
        Federal Major Crimes Section
        555 4th Street, N.W.  #4235
        Washington, DC 20001
        Tel. (202) 305-1419
        Fax (202) 514-6010

---

provisions with respect to limitations of factors to be considered in imposing sentence clearly reflect the will on Congress on this issue, see 28 U.S.C. § 944(e), therefore, we respectfully ask that these factors be given appropriate consideration by the Court.